**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**SPIN MASTER LTD.,**

                             **Plaintiff,**                    **11-CV-1000A (Sr)**

**v.**


**BUREAU VERITAS CONSUMER PRODUCTS**
**SERVICE, INC. and**
**EUROFINS PRODUCT SAFETY LABS, INC.,**

                             **Defendants.**

_____


## DECISION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.  Dkt. #17.


Currently before the Court is Eurofins Product Safety Labs' ("Eurofins'"), motion to quash subpoenas issued by Spin Master, Ltd. ("Spin Master"), upon Daniel P. Goldberg and Dorit Ungar, Eurofins' attorneys in _Spin Master, Ltd. v. Bureau Veritas Consumer Products Service, Inc._, 08-CV-923, and the products liability class action lawsuit pending in the Northern District of Illinois; entering a protective order preventing Spin Master from deposing Mr. Goldberg and Ms. Ungar or obtaining their documents; and imposing sanctions pursuant to Rule 45(c)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 for Spin Master's improper conduct in issuing the subpoenas .  Dkt. #1.   For the following reasons, the motion is granted.

## BACKGROUND

Spin Master commenced distribution of Aqua Dots for retail sale in April of 2007. In June of 2007, Spin Master retained defendant Bureau Veritas Consumer Products Services, Inc. ("Bureau Veritas"), to conduct live animal toxicity testing on Aqua Dots. Bureau Veritas engaged defendant Eurofins to perform oral acute toxicity animal tests pursuant to 16 C.F.R. § 1500.3(c)(2)(i)(A), which defines acute toxicity as any substance producing death within 14 days in half or more than half of a sufficient group of white rats when a single dose from 50 milligrams to 5 grams per kilogram of body weight is administered orally.

Eurofins noted difficulty in getting the rats to ingest the beads and reported on August 10, 2007 that

> 38 spheres of each color of the pellets from the above product provided by the Sponsor were placed into an appropriate container and covered with 10 ml of corn oil by [Eurofins]. The prepared sample was then placed into an incubator for 72 hours at 37-39°C. The resulting extract solution was considered to be the test substance.

> * * *

> The test substance was administered orally at a dose level of 5,000 mg/kg to three female rats following the Up-Down procedures described in PSL's test method P203, ACTS and Federal Hazardous Substances Act, 16 CFR, Section 1500.3, 1999. All animals survived, gained body weight and appeared active and healthy during the study. There were no signs of gross toxicity, adverse pharmacological effects or abnormal behavior. Based on these results, the test substance is not considered to be toxic according to 16 CFR, Section 1500.3(c)(2)(i)A), 1999.

On November 7, 2007, Aqua Dots were recalled after children ingested the dots and became comatose due to the presence of 1,4-butanediol, a chemical which metabolized into gamma-hydroxy butyrate ("GHB"), a/k/a the date rape drug.

Following the recall, Spin Master, through its counsel, Ronald Rothstein, responded to requests for information from the Consumer Product Safety Commission ("CPSC"). By letter dated October 17, 2008, Mr. Rothstein informed the CPSC of the chronology and summary of testing by multiple independent certified testing labs and provided the following information with respect to the Bureau Veritas/Eurofins Acute Oral Toxicity Testing:

> On or about June 6, 2007, Spin Master Ltd. contacted Bureau Veritas Consumer Products Services ("BVCPS") to request that it evaluate its Aqua Dots beads for acute oral toxicity as defined in and tested per 16 CFT 1500.3(c)(2)(i). Spin Master requested this testing in response to concerns expressed by QVC regarding the possibility of absorption of PVA from Aqua Dots by the digestive tract. . . .

> BVCPS engaged Eurofins Product Safety Laboratories, Inc. ("Eurofins") to conduct the testing. On information and belief, Eurofins completed the test following the Up-Down procedures described in PLS's test protocol P203, ACTS and Federal Hazardous Substances Act, 16 CFR, Section 1500.3(c)(2)(i), which requires animal testing.

> Lori Trock of BVCPS reported that Eurofins experienced difficulty in breaking down the Aqua Dots beads such that the lab animals would ingest them, resulting in a delay. BVCPS reported in late July that Eurofins found a new method and the results should be available in two weeks. On August 10, 2007, Spin Master received a formal report that the beads were not toxic according to 16 CFR 1500.3(c)(2)(i).

> Eurofins' report to BVCPS stated that Eurofins tested the beads using corn oil in order to dose the lab animals.

Eurofins reported that the animals survived, gained body weight, appeared active and healthy during the study, and showed no signs of gross toxicity, adverse pharmacological effects or abnormal behavior. Based on these results, Eurofins issued its formal report finding that the beads were not considered to be toxic according to 16 CFR 1500.3(c)(2)(i). BVCPS approved the Eurofins report and certified Aqua Dots as non-toxic.

In the MDL putative class action lawsuit, Spin Master subpoenaed Eurofins' test documents relating to the animal study and those documents are being provided in response to this Request. In addition, Spin Master's counsel deposed Eurofins employees Carolyn Lowe and Jennifer Durando on October 15, 2008. . . . Through the Eurofins documents and employee depositions, it was learned that Eurofins first attempted to soak 38 beads in distilled water for 72 hours, but that sample preparation was deemed a failure by Eurofins because the beads absorbed the water and stuck together. Eurofins next tried to grind new beads (not those that had been soaked in water) using a coffee grinder, but the result was deemed not capable of being dosed to the lab animals. Eurofins next soaked 38 new beads in corn oil, and at the end of 72 hours it took the resulting corn oil and used it to dose the lab animals. Eurofins did not measure the extent to which the beads had dissolved into the corn oil. Eurofins treated the corn oil solution as though it were comprised entirely of the test beads in determining the 5,000 mg/kg dosage for each test animal, as prescribed by 16 CFR 1500.3(c)(2)(i).

In its complaint, filed December 17, 2008, Spin Master alleges that the toxicity test was flawed because the animals did not ingest the dots, but were given corn oil in which the dots had been soaked, and that the dosing of animals did not conform with the federal regulation setting forth the oral toxicity animal test for a child's toy, *to wit*, 16 C.F.R. § 1500.3(c)(2)(i)(A). Spin Master seeks more than $100 million in damages due to defendants' gross negligence and negligence.

By letter dated June 19, 2009, Mr. Rothstein responded to the CPSC's request that Spin Master assess its compliance with the Federal Hazardous Substances Act and the reporting requirements of the Consumer Product Safety Act. In that letter, Mr. Rothstein argues, *inter alia*, that Aqua Dots are not toxic.

By Decision and Order entered August 24, 2011, the Court denied Spin Master's motion for a protective order to prevent the enforcement of a subpoena issued by Eurofins upon Mr. Rothstein. Dkt. #132. In reaching that conclusion, the Court determined that

> Mr. Rothstein clearly possesses relevant information regarding the factual basis for Spin Master's position before the CPSC, *to wit*, Aqua Dots are not toxic. That position is integral to the resolution of the central question in this matter, *to wit*, whether Eurofins' toxicity testing was flawed. As the individual responding to requests for information from the CPSC, Mr. Rothstein is in the best position to answer questions regarding communications between Spin Master and the CPSC and identify the sources of information relied upon in crafting those communications. "Although his responses are not likely to be based on firsthand knowledge, that limitation alone should not preclude [Eurofins] from examining in the most effective way possible the sources of information upon which the [position] is based." *Tailored Lighting v. Osram Sylvania Products*, 255 F.R.D. 340, 345 (W.D.N.Y. 2009).

> As to the risk of encountering privilege and work-product issues, the Court is satisfied that the scope of the subpoena is sufficiently narrow as to minimize that risk. The subpoena does not suppose to question Mr. Rothstein as to his communications with Spin Master employees, but rather his communications with the CPSC. As Magistrate Judge Cox determined, the non-compulsory disclosure of information to an investigating government agency waived any protection such information may have enjoyed pursuant to the attorney work product doctrine. *See In re Steinhardt Partners, L.P.*, 9 F.3d 230 (2d Cir. 1993).

> With respect to the extent of discovery already conducted, the Court has concluded that efficiency will be served by permitting the deposition of Mr. Rothstein during these early stages of discovery, as this will permit defendants to readily identify documents relied upon by Mr. Rothstein and individuals with first hand information regarding the underlying facts of this matter.

08-CV-923 at Dkt. #132.  Plaintiff appealed that Order, which was affirmed by the Hon.

Richard J. Arcara.  08-CV-923 at Dkt. #156.


On September 26, 2011, Spin Master served subpoenas, captioned in the

Southern District of New York, upon Eurofins' counsel, Daniel Goldberg and Dorit

Ungar.  Dkt. #3, pp.2-9.  The subpoenas seek to examine Mr. Goldberg and Ms. Ungar

on their communications with the CPSC following the CPSC's request to review

discovery in this action.  Dkt. #3 & Dkt. #4-1.  Ms. Ungar's subpoena also seeks

examination of any communication between Ms. Ungar and

> • any employee, officer, or director of Spin Master outside of the presence of counsel for Spin Master;
>
> • any relatives of any employee, officer or director of Spin Master outside of the presence of counsel for Spin Master;
>
> • any relatives of any in house attorney or outside attorney of Spin Master outside of the presence of counsel for Spin Master; and
>
> • her client, her law firm and her client's insurance carriers related to the communications set forth above.

Dkt. #3-1, p.8.


Mr. Goldberg declares that his only communication with the CPSC

concerning Spin Master or Aqua Dots occurred in September 2011 when CPSC

counsel Seth Popkin contacted him to follow up on the documents previously produced

to the CPSC at Spin Master's request.  Dkt. #4, ¶¶ 4 & 6.  Specifically, Mr. Goldberg

declares that he conversed with CPSC counsel Seth Popkin twice regarding the dates

of document production and bates numbers, as well as the specific location within those

documents where Spin Master claimed Aqua Dots were toxic.  Dkt. #4, ¶ 4.  More

specifically, Mr. Goldberg recalls that he directed Mr. Popkin to Spin Master's amended

complaint and transcript of the March 24, 2011 oral argument before the undersigned in

08-CV-923.  Dkt. #12.  In an e-mail to Spin Master's counsel, Ron Rothstein, dated

October 13, 2011, seeking withdrawal of the subpoenas, Mr. Goldberg explained that

> the CPSC asked us for information about the scope of your
> document productions in terms of bates numbers and
> production dates so that they could confirm they have
> received everything from you, and they asked where they
> might find in the production or record information on certain
> discrete issues, in response to which I directed them to
> publicly available information.  That is the sum total of my
> communications with the CPSC in connection with Spin
> Master, none of which has any bearing on any issue in this
> case.

Dkt. #4-3, p.2.


Ms. Ungar declares that her only communications with the CPSC

concerning this matter occurred in June/July of 2010 and in September of 2011 and

were limited to a discussion of documents produced in 08-CV-923.  Dkt. #3 & Dkt. #11.

Ms. Ungar states that Spin Master's counsel was copied on her e-mail communication

with respect to the CPSC's request for documents and that the only other

communications she had with CPSC counsel was a telephone call where Mr. Popkin

inquired about the scope of Spin Master's document production in this case and the

location in the record of Spin Master's comments about the toxicity of Aqua Dots and an inquiry as to the bates numbers and dates of defendants' last document production to Spin Master. Dkt. #3. With respect to the remainder of the subpoena, Ms. Ungar declares that she attended a Sabbat dinner at which Ronnen Harary, Spin Master's co-CEO, and Douglas Rothstein, the brother of Spin Master's counsel, were also invited guests. Dkt. #4. Ms. Ungar declares that she "had no discussions with Messrs. Harary or Douglas Rothstein about the merits of this action, and my communication with them about the case was limited to identifying who I was." Dkt. #3.

Although Spin Master electronically filed a redacted declaration from Mr. Harary in response to defendant's motion to quash the subpoena and presumably provided an unredacted copy of the declaration to the Hon. Alvin K. Hellerstein in the Southern District of New York, Spin Master failed to comply with the Court's Order dated January 15, 2013 directing the parties to provide unredacted copies of their motion papers to the undersigned. Dkt. #18. However, in her reply declaration, Ms. Ungar recounts that Mr. Harary declared that Ms. Ungar "discussed the substance of the litigation, [my] views of the case, stated [I] would win this case and attempted to portray [his] company's position in this litigation negatively." Dkt. #11, ¶ 5. Ms. Ungar denies this characterization of their interaction and emphasizes that Mr. Harary identifies nothing of substance that was allegedly discussed. Dkt. #11, ¶ 5.

The motion was transferred to this district on consent of all parties by Order of the Hon. Alvin K. Hellerstein on October 31, 2011. Dkt. #14.

## DISCUSSION AND ANALYSIS

Spin Master argues that the subpoenas are warranted because counsel for Bureau Veritas has disclosed that the CPSC had engaged him in discussion on "issues relevant to this case and the CPSC's separate investigation of Aqua Dots." Dkt. #7, ¶ 4. Spin Master further argues that Eurofins' arguments in support of the deposition of Mr. Rothstein estop them from opposing the depositions of Mr. Goldberg and Ms. Ungar. Dkt. #7, ¶ 7.

"The deposition-discovery regime set out by the Federal Rules of Civil Procedure is an extremely permissive one to which courts have long accorded a broad and liberal treatment to effectuate their purpose that civil trials in the federal courts [need not] be carried on in the dark." *In re Friedman*, 350 F.3d 65, 69 (2d Cir. 2003) (internal quotation omitted); *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."). "However, pursuant to Rule 26(c), the court may limit discovery even if the information sought is relevant." *Tisby v. Buffalo General Hosp.*, 157 F.R.D. 157, 170 (W.D.N.Y. 1994); *Coyne v. Houss*, 584 F. Supp. 1105, 1109 (E.D.N.Y. 1984); *See* Rule 26(c) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.").

"Courts have been especially concerned about the burdens imposed on the adversary process when lawyers themselves have been the subject of discovery requests, and have resisted the idea that lawyers should routinely be subject to broad

discovery." *Friedman*, 350 F.3d at 70; *see U.S. v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (1991) ("depositions of opposing counsel are disfavored."). Among the myriad reasons for such concern is the prospect of "intruding on attorney-client privilege." *Id.* Morever, courts recognize that "even a deposition of counsel limited to relevant and non-privileged information risks disrupting the attorney-client relationship and impeding the litigation." *Sea Tow Int'l, Inc. v. Pontin,* 246 F.R.D. 421, 424 (E.D.N.Y. 2007) (citations omitted). As a result, the Court of Appeals for the Second Circuit has instructed district courts to consider "all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship," including, but not limited to, "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Id.* at 72.

In the instant case, in contrast to the subpoena seeking to depose Mr. Rothstein as to the factual basis for his contradictory communications to the CPSC regarding the toxicity of Aqua Dots, Spin Master has not articulated any basis to believe that Mr. Goldberg or Ms. Ungar's communications with the CPSC proffered factual information relevant to the prosecution or defense of this action. Defendant's cooperation with the CPSC's investigation of Aqua Dots is not sufficient to justify depositions of defendant's counsel. *See New York Indep. Contractors Alliance, Inc. v. Highway Rd. and St. Constr. Laborers Local Union 1010*, 07-CV-1830, 2008 WL 5068870, *6 (E.D.N.Y. Nov. 24, 2008) ("A subpoena seeking to depose opposing

counsel should be quashed when the attorney's role is limited to legal representation."). In addition, Spin Master has proffered no basis to believe that deposing Ms. Ungar as to her interaction with either it's co-CEO or it's counsel's brother will lead to relevant evidence. *See Petersen v. Vallenzano*, No. 89 Civ. 5346, 1996 WL 252376, at *6 (S.D.N.Y. May 13, 1996) (denying defendant's request to depose plaintiff's counsel for failure "to indicate the relevance of the deposition testimony . . .to the substance of any issue in this action").

As set forth in Rule 45(c)(1) of the Federal Rules of Civil Procedure, when a party issues a subpoena without taking "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," the court must "impose an appropriate sanction – which may include lost earnings and reasonable attorney's fees – on [the] party or attorney who fails to comply." In a circumstance, such as this, where "a subpoena should not have been issued, literally everything done in response to it constitutes an 'undue burden or expense' within the meaning of . . . Rule 45(c)(1)." *Molefi v. Oppenheimer Trust*, No. 03 CV 5631, 2007 WL 538547, at *3 (E.D.N.Y. Feb. 15, 2007), *quoting Builders Ass'n of Greater Chicago*, No. 96 C 1122, 2002 WL 1008455, at *4 (N.D. Ill. May 13, 2002).

In addition to its authority pursuant to Rule 45(c)(1), the Court retains its inherent authority to impose attorney's fees "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Kenney, Becker, LLP v. Kenney*, No. 06 Civ. 2975, 2008 WL 681452, at * (S.D.N.Y. Mar. 10, 2008), *quoting Chambers v.*

*NASCO*, 501 U.S. 32, 45-46 (1991). "In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *Id., quoting Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 326 (2d Cir. 1999). As the Court has determined that Ms. Ungar's interaction with Mr. Harary and Douglas Rothstein lacks relevance to the prosecution or defense of this action and that there is an obvious distinction between the facts warranting the deposition of Ronald Rothstein and the circumstances surrounding Mr. Goldberg and Ms. Ungar's interaction with the CPSC, it follows that the subpoenas were issued without a colorable basis. Moreover, the inquiry into Ms. Ungar's interaction with Mr. Harary and Douglas Rothstein can be ascribed no legitimate purpose. Accordingly, sanctions, in the form of reasonable attorney's fees incurred as a result of the issuance of the subpoena's are appropriate pursuant to both Rule 45(c)(1) and the Court's inherent authority.

## CONCLUSION

For the reasons set forth above, Eurofins' motion to quash subpoenas issued by Spin Master upon Daniel P. Goldberg and Dorit Ungar, Eurofins' attorneys in *Spin Master, Ltd. v. Bureau Veritas Consumer Products Service, Inc.*, 08-CV-923, and the products liability class action lawsuit pending in the Northern District of Illinois is granted. In addition, Spin Master shall pay Eurofins the cost, including reasonable attorneys' fees, generated in response to the issuance of subpoenas upon Mr. Goldberg and Ms. Ungar. If the parties are unable agree as to the appropriateness of

Eurofins' attorneys' fees, an application shall be submitted to the Court, by notice of

motion for award of attorneys' fees, within 60 days of the entry of this Order.

**SO ORDERED.**

**DATED:** **Buffalo, New York**
**August 29, 2013**

_s/ H. Kenneth Schroeder, Jr._
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**